IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

CHARLOTTE LOUISE EMERY      )
                               )
v.                              )     No. 2:08-0051
                               )     Judge Nixon/Bryant
SOCIAL SECURITY ADMINISTRATION   )

To:    The Honorable John T. Nixon, Senior Judge

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Social Security Administration ("SSA" or "the Administration"), through its Commissioner, denying plaintiff's application for disability insurance benefits ("DIB"), as provided under Title II of the Social Security Act ("the Act"). The case is currently pending on plaintiff's motion for judgment on the administrative record (Docket Entry No. 15), to which defendant has responded with its own motion for judgment (Docket Entry Nos. 19, 20).[1] Upon consideration of these papers and the transcript of the administrative record (Docket Entry No. 13),[2] and for the reasons given below, the undersigned recommends that plaintiff's motion be GRANTED, that defendant's motion be DENIED, and that the decision of the SSA be REVERSED and the cause REMANDED for

---

[1]For purposes of future filings, defendant is reminded that the undersigned's scheduling order in these cases (Docket Entry No. 14) directs the filing of *a brief in response* to plaintiff's motion, not the government's own cross-motion for judgment.

[2]Referenced hereinafter by page number(s) following the abbreviation "Tr."

Case 2:08-cv-00051   Document 22   Filed 07/06/09   Page 1 of 33 PageID #: 72

further administrative proceedings consistent with this report.

# I. Introduction

Plaintiff, who at the time of the SSA's final decision was 57 years old with a high school education and past relevant work as a family service assistant at a Head Start program (Tr. 21), filed her DIB application on August 2, 2004, alleging that she became unable to work as of July 14, 2003 due to severe headaches and pain in her right arm, as well as depression, anxiety, and memory loss. (Tr. 76, 161). That application was denied at the initial and reconsideration stages of state agency review (Tr. 44-46, 48-49). Thereafter, plaintiff requested and received a *de novo* hearing before an Administrative Law Judge ("ALJ") of the SSA's Office of Hearings and Appeals. The hearing was held on May 25, 2006, and plaintiff appeared with counsel and gave testimony (Tr. 477-505). The ALJ took the case under advisement until October 17, 2006, when he issued a written decision wherein he found plaintiff not disabled (Tr. 37-42). Plaintiff appealed that decision to the SSA's Appeals Council, and won a reversal of the decision on April 27, 2007 (Tr. 57-59). The matter was remanded to the ALJ with instructions to rehear the case and to issue a new decision which addresses various critical issues. Id.

On October 5, 2007, the ALJ held a second hearing at which plaintiff again appeared with counsel and gave testimony. (Tr. 506-27) At the conclusion of this hearing, the ALJ took the case under advisement until February 13, 2008, when he issued a second written decision which was partially favorable to plaintiff (Tr. 16-22). This decision contains the following enumerated findings:

1.     The claimant met the disability insured status requirements of the Act on July

2

14, 2003, the date the claimant stated she became unable to work, and continues to meet them through December 31, 2008.

2.  The claimant has not engaged in substantial gainful activity since July 14, 2003.

3.  The medical evidence establishes that the claimant has severe impairments including degenerative disc disease and possible fibromyalgia, but that she does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4.  The claimant's subjective complaints are not credible to the extent alleged.

5.  The claimant had the residual functional capacity to perform work related activities except for the following limitations:  lifting a maximum of twenty-thirty pounds occasionally and ten pounds frequently; standing and/or walking about two-three hours in an eight-hour workday; sitting about six hours in an eight-hour workday; no climbing or crawling; and only occasional stooping or kneeling during the period from July 14, 2003 through April 23, 2007.  (20 CFR 404.1545).

6.  The claimant's past relevant work as a family service assistant at a Head Start program did not require the performance of work related activities precluded by the above limitation(s) (20 CFR 404.1565).

7.  The claimant's impairments did not prevent the claimant from performing her past relevant work during the period from July 14, 2003 through April 23, 2007.

8.  The claimant was not under a "disability" as defined in the Social Security Act, at any time during the period from July 14, 2003 through April 23, 2007 (20 CFR 404.1520(e)).

9.  The claimant had the residual functional capacity to perform work related activities except for the following limitations:  lifting a maximum of about ten pounds; standing and/or walking about two hours in an eight-hour workday; sitting about six hours in an eight-hour workday; no climbing or crawling; only occasional stooping or kneeling; and inability to sustain an eight-hour day/forty-hour week work schedule during the period pertinent to this

3

decision since April 24, 2007 (20 CFR 404.1545).

10.    The claimant is 57 years old, which is defined as advanced age (20 CFR 44.1563).

11.    The claimant has a high school education (20 CFR 404.1564).

12.    The claimant does not have any acquired work skills which are transferable to the skilled or semiskilled work activities of other work (20 CFR 404.1568).

13.    If the claimant retained the residual functional capacity for the full range of sedentary work, Rule 201.06 would apply and direct a finding of disabled.  As the claimant may be found disabled based on her exertional limitations alone, her nonexertional limitations need not be further addressed.  Section 200.00(e)(2), Appendix 2, Subpart P, Regulations No. 4.

14.    The claimant has been under a "disability," as defined in the Social Security Act, since April 24, 2007 (20 CFR 404.1520(g)).

(Tr. 21-22)

On April 11, 2008, the Appeals Council denied plaintiff's request for review of the ALJ's decision (Tr. 6-8), thereby rendering that decision the final decision of the Administration.  This civil action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. § 405(g).  If the ALJ's findings are supported by substantial evidence, based on the record as a whole, then those findings are conclusive.  Id.

4

## II. Review of the Record[3]

### A. Medical Evidence

Ms. Emery saw Dr. Joshi, her primary care physician, on February 22, 2002, for complaints of neck and left shoulder pain, which was diagnosed as degenerative arthritis and treated with analgesics (Tr. 216). On March 4, she was seen for persistent discomfort, was noted to have minimal tenderness over her left shoulder and the left side of her neck, and she had a normal back and neurological exam. Id. Dr. Joshi diagnosed back and left shoulder pain, advised Ms. Emery to return to work without restrictions, and recommended a C-spine and left shoulder MRI. Id. A cervical spine MRI on March 7 revealed disc bulging at C4, 5 and 6, and mild to moderate stenosis at C5 and C6 with mild ventral cord impingement (Tr. 248). A left shoulder MRI on March 12 revealed that Ms. Emery had a possible rotator cuff impingement, no rotator cuff tear, probable mild supraspinatus tendinitis and peritendinitis, and left AC joint arthritis (Tr. 245). On March 26, 2002, Dr. Pagnani, an orthopedist, injected Ms. Emery's left shoulder (Tr. 346). She had a course of physical therapy for cervical and lumbar pain in March and April which were reported resolved on April 29, 2002 (Tr. 238-42). However, Ms. Emery underwent an arthroscopic subacromial decompression surgery to address her persistent left shoulder pain on July 9, 2003 (Tr. 338-39). Dr. Pagnani advised her to avoid all above-shoulder activities for three weeks (Tr. 340). By August 22, 2003, Ms. Emery was reportedly doing "extremely well" with full motion and minimal pain (Tr. 335).

She was seen on October 24, 2002, for complaints of persistent pain in her

_____

[3]The following comprehensive record review is taken from defendant's brief (Docket Entry No. 20 at 1-15), with only minor modification by the undersigned.

5

lower extremities, muscle pain and arthralgia (Tr. 214). Noting her RA factor and ANA were negative and her SED rate was normal, Dr. Joshi diagnosed arthralgia, myalgia, and medication toxicity, and discontinued Lipitor and Lopid (Tr. 214).

Ms. Emery presented to Jamestown Regional Medical Center on March 10, 2003, complaining of dizziness, and tingling in her arms and legs (Tr. 195-96). She appeared somewhat anxious with a depressed mood and she advised that her son had died the previous month in that same emergency room (Tr. 196-97, 200). Examination indicated that her recent and remote memory were intact, she had normal gait and station, normal muscle strength and tone, and normal neurovascular status (Tr. 197). Diagnosed with hyperventilation and hypokalemia (abnormally low potassium level in the blood), she was treated and released (Tr. 197, 200).

On March 17, 2003, Dr. Joshi noted Ms. Emery's visit to the emergency room due to weakness and tiredness, and diagnosed hypokalemia, neck pain and degenerative arthritis (Tr. 214). On March 18, 2003, he saw Ms. Emery for pain in the posterior aspect of her neck and the suprascapular areas of her shoulders. Id. He diagnosed neck and bilateral shoulder pain, and injected Ms. Emery's left shoulder. Id.

On April 30, 2003, she saw orthopedist, Dr. Nichols for complaints of chronic cervicalgia and intermittent left upper extremity symptoms (Tr. 381). Examination revealed she was not in acute distress, strength and reflexes were intact, she had diminished sensation in the left medial nerve distribution, but otherwise sensation was intact (Tr. 3813-82). Her shoulders had full range of motion with no signs of impingement, and there was restricted cervical range of motion with no focal tenderness (Tr. 382). X-rays revealed cervical spondylosis with no evidence of mal-alignment, and Ms. Emery was referred to physical

6

therapy and provided medication.  Id.  A cervical MRI on May 22, 2003, revealed non-compressive disc protrusion at C4-5; minimal decreased disc height, posterior osteophyte, mild spinal stenosis and non-compressive narrowing at C5-6; minimal decreased disc height, osteophyte, mild spinal stenosis, and left neural foraminal stenosis impinging the exiting left C7 nerve root (Tr. 379-80).  Dr. Nichols noted on May 28, 2003, that although Ms. Emery reported no improvement in her symptoms she was, in fact, having no left arm pain, no numbness, tingling or pain radiating in a specific dermatologic distribution, and the numbness in her hand had improved at night and when driving, with the utilization of a wrist splint (Tr. 375).  She was neurologically intact, had a positive Tinel's at the left wrist, but otherwise her strength, sensation and reflexes were unchanged.  Id.  Dr. Nichols noted the MRI results that indicated some impinging of the C7 nerve root, but observed that Ms. Emery was not having C7 radicular symptoms (Tr. 375).  Noting that Ms. Emery was not experiencing progressive neurologic deficit, loss of bowel or bladder control, or severe unremitting pain, Dr. Nichols prescribed physical therapy (Tr. 375).  On June 5, 2003, Ms. Emery reported no improvement, but after discussion Dr. Nichols determined that her report was not accurate as she had some improvement with physical therapy (Tr. 372).  Ms. Emery was only experiencing some neck stiffness and it was noted that an EMG had not revealed any evidence of ulnar neuropathy, or C5 to T1 radiculopathy (Tr. 370-71, 372).  Further, Ms. Emery had no focal trigger points involving the trapezius or rhomboid muscles, she was neurologically intact with no evidence of deficits, had no complaints of progressive weakness or sensory deficits, and her pain was well localized to the lateral neck and the paraspinals (Tr. 372).  She saw orthopedist Dr. Nichols on July 3, 2003, for complaints of left elbow pain (Tr. 367).  It was noted that she had full range of motion in the elbow with no tenderness to

7

palpation, and had full shoulder range of motion with some pain at abduction extreme consistent with left shoulder impingement; she was neurologically intact with regard to her strength and sensation, and had normal reflexes.  Id.  Noting that she did not have a progressive neurologic deficit, loss of bowel or bladder control, or severe unremitting pain, Dr. Nichols recommended she go ahead with her scheduled shoulder surgery (Tr. 367).

On September 25, 2003, Ms. Emery had a pubo-vaginal sling procedure performed by Dr. Mansur to address urinary stress incontinence (Tr. 203-04, 206A-09, 318-19).  A pre-op physical on September 24, 2003, revealed a normal mood and affect, normal neck, normal gastrointestinal, respiratory, and cardiac systems, and arthritis (Tr. 320-21). Dr. Mansur's follow-up notes show that on October 7, 2003, Ms. Emery was doing well (Tr. 210).  On December 5, 2003, he noted slight spontaneous leakage, but no stress incontinence, and Ms.  Emery was given Kegel exercises.  Id.

On January 5, 2004, Ms. Emery reported recurrent shoulder pain after an attempt to help move a table (Tr. 333, 334).  Neck x-rays showed degenerative changes, but her shoulder was unremarkable, the diagnosis was cervical strain and corticosteroids were prescribed (Tr. 333).  On March 20, 2004, Dr. Mansur reported there was no spontaneous leakage, mild occasional stress incontinence, and Kegel exercises were recommended.  Id.

Ms. Emery saw Dr. Joshi on March 31, 2004, for arthralgia and muscle pain (Tr. 213).  Examination revealed an unremarkable back, she was intact neurologically, and had no edema in her extremities.  Id.  Noting she was on Effexor and Previcid, Dr. Joshi diagnosed left shoulder and back pain, degenerative arthritis, and gastritis, and treated Ms. Emery with an injection of Kenalog.  Id.  On April 27, 2004, Dr. Joshi remarked that Ms. Emery was doing remarkably well, observed that she was not working and enjoyed staying

8

home and did not appear to be under any stress (Tr. 213). Examination revealed minimal lower back and left shoulder tenderness, she was intact neurologically and had no edema. Id. He diagnosed anemia, hyperlipidemia, liver dysfunction, arthralgia, and hyperglycemia, ordered tests, and continued her medication (Tr. 213). On May 17, 2004, Ms. Emery was seen for complaints of severe epigastric pain, nausea, and constipation, resulting in diagnoses of gastritis and reflux esophagitis, which were treated with Maalox and the cessation of Vioxx (Tr. 212). On May 28, 2004, Ms. Emery complained of arthralgia and back, leg, and shoulder pain, and tests were ordered. Id. In June 2004, Ms. Emery was referred to orthopedist, Dr. Nichols, and to Dr. Shah for her stomach complaints (Tr. 211). Dr. Joshi noted cervical spine and right shoulder tenderness, diagnosed neck pain, cervical radiculopathy, gastritis, and irritable bowel syndrome, and observed that there was a need to see a neurologist. Id. On June 22, 2004, Dr. Shah noted that Ms. Emery had undergone endoscopy and colonoscopy for abdominal pain and other symptoms, after which she was advised to get another colon exam in 7-10 years, check her thyroid yearly, continue Previcid, and follow a prescribed diet high in fiber, water, and vegetables (Tr. 229).

On June 24, 2004, Dr. Nichols reported that Ms. Emery was not having any radicular symptoms into her upper extremities, she was neurology intact, had normal grip strength, no signs of shoulder impingement, no tenderness with palpating the subacromial space, had normal sensation, no evidence of atrophy when comparing her left and right upper extremities, but had restricted cervical range of motion with extension and was tender to palpation laterally on the cervical spine (Tr. 358). He diagnosed cervical spondylosis, i.e., degenerative disc disease without evidence of radiculopathy. Id. A neurologic consultation was recommended to address her complaints of memory loss associated with headache, and

9

she was provided Ultracet to take as needed for pain (Tr. 359).

Dr. Joshi reported on July 20, 2004, that Ms. Emery took Prozac for depression, but she did not have an underlying mental disorder that significantly interfered with her functioning (Tr. 324). On that same day she was examined by her neurologist, Dr. Ngo, who found her to have a normal affect, normal attention, and intact recent and remote memory (Tr. 286). Her muscles had normal tone, bulk and strength, intact station coordination and gait, and no ataxia or postural instability (Tr. 287) Dr. Joshi reviewed her medical records and determined that Ms. Emery had severe cervical spondylosis with cord impingement that would require a repeat MRI to determine whether surgical decompression was required; she appeared to have a C5 radiculopathy by history; and she had chronic cervicalgia associated with headaches, for which he prescribed medication. Id. Dr. Ngo ordered an EMG for suggested carpal tunnel syndrome and cervical radiculopathy, blood tests, and considered a shoulder MRI. Id. An EMG conducted on July 23, 2004, revealed moderate right carpal tunnel syndrome, and no evidence of right C-5 or C-6 radiculopathy (Tr. 288). On August 30, 2004, Ms. Emery reported that she felt better with decreased headache and arm pain (Tr. 285). She advised that she was sleeping well at night, had started Effexor for weight loss, and requested Prozac which she reported taking for a long time and having done better with it. Id. On September 3, 2004, Dr. Joshi noted minimal tenderness over the cervical spine, and he diagnosed neck and back pain, as well as degenerative arthritis (Tr. 211).

Ms. Emery returned to Dr. Ngo on October 2, 2004, reporting worsening depression regarding the death of her son, hip pain, resolution of her dyspepsia, and not much headache or neck pain (Tr. 282). Prozac was increased, and her right hip was injected.

10

Id. On November 22, 2004, she reported having responded well to the injection, but pain was returning (Tr. 281). After examination revealed persistent right hip tenderness, she was injected and continued on Prozac for anxiety and depression (Tr. 281).

Ms. Emery saw Mr. Loftis, M.A., a state agency consulting psychologist, on November 23, 2004, for an evaluation (Tr. 265-68). Mr. Loftis observed that Ms. Emery, accompanied by her mother, arrived on time, was adequately groomed, had a normal gait, normal motor skills, and was cooperative (Tr. 265). Ms. Emery reported that she had left her job of 22 years as a family services coordinator at Head Start because the job was requiring more computer skills and getting more demanding (Tr. 266). She attended church frequently, interacted with her community, and lived in a house in the country where she did most of the routine housework. Id. Ms. Emery advised that her husband of 34 years traveled a lot and was not at home. Id. Mr. Loftis observed that Ms. Emery's executive functioning skills were intact. Id. Intelligence tests revealed average intellectual functioning, and she had intact remote memory (Tr. 267). Mr. Loftis opined that Ms. Emery had recurrent depression with moderate features that would cause moderate impairment in her ability to function in a work environment (Tr. 268). He stated that Ms. Emery would "probably" have difficulty with certain cognitive tasks and dealing with any kind of stress, and that stressful work situations would "probably" cause her to decompensate. Id. Ms. Emery appeared capable of relating appropriately to others, could follow written instructions, and overall, her functional limitations were moderate. Id.

On January 2, 2005, Ms. Emery presented to Dr. Ngo with complaints of left shoulder pain after working on a painting (Tr. 279). She reported that her headaches were much better, she had no arm weakness, and had noted significant improvement in her mood

11

and depression since taking Topamax.  Id.  Although she complained of stuttering and an unsteady gait, Dr. Ngo's exam only revealed tenderness of the left shoulder, especially with rotation (Tr. 279).  Examination on January 18, 2005, prior to removal of a lipomatous growth in her left groin, revealed that her neck was supple, she had a coordinated and smooth gait, was neurologically intact, and had normal judgment and normal insight (Tr. 270-73).

She returned to Dr. Pagnani for evaluation of bilateral shoulder and right knee pain on January 19, 2005 (Tr. 406).  Examination revealed mild tenderness bilaterally at the AC joint, worse on the left; her knee was point tender over the right lateral joint line, with no medial joint line tenderness and minimal pain with patellar compression.  Id.  Review of her knee MRI results had been interpreted as normal, although Dr. Pagnani noted what appeared to be some signal intensity increase in the lateral meniscus, and the shoulder MRI was unremarkable.  Id.  Knee arthroscopy and left shoulder injection were to be performed (Tr. 407).  Ms. Emery had right knee arthroscopy for a partial lateral meniscus tear and a left shoulder injection on January 26, 2005 (Tr. 404-05).

A nonexamining, state agency psychological consultant reviewed Ms. Emery's file on January 17, 2005, and assessed moderate limitations associated with current depression.  (Tr. 293-308)

A nonexamining, state agency physician reviewed Ms. Emery's file on January 31, 2005, and opined that she could occasionally lift and carry 50 pounds, 25 pounds frequently; sit, stand and/or walk about 6 hours in an 8-hour day; and had limitations in the

use of her right upper extremity[4], with limitations in fingering and feeling, but no postural or other limitations (Tr. 310-17).

On March 22, 2005, Ms. Emery saw Dr. Ngo with complaints of left occipital headaches, neck and shoulder pain, right hip pain, and numbness and tingling in her hands and arms (Tr. 275). Dr. Ngo remarked that her motor function was normal with no intrinsic atrophy of her hand muscles. Id. She was placed back on Nortriptyline, and Topamax and Prozac were continued since her depression was substantially improved (Tr. 275). Dr. Joshi noted minimal tenderness over the cervical spine and low back on April 20, 2005, diagnosed degenerative arthritis and prescribed muscle relaxants and the narcotic Ultram for pain relief (Tr. 420).

On April 27, 2005, Dr. Pagnani noted that Ms. Emery was much improved with therapy (Tr. 392-99), although she still had some mild aching knee pain (Tr. 400). She was to continue a home exercise program and follow up as needed. Id. A lumbar spine MRI on April 28, 2005, was normal, as was a right hip MRI (Tr. 426).

On June 6, 2005, Ms. Emery saw Dr. Ngo for complaints of hand numbness and tingling, but reported no longer having severe headaches (Tr. 408). Dr. Ngo reported that Ms. Emery was doing fine neurologically, but that pain was a persistent problem, and consultation with a pain specialist was recommended. Id. On July 28, 2005, Dr. Joshi reported that Ms. Emery had right carpal tunnel syndrome for which she requested surgery, and he referred her to Dr. Jestus (Tr. 418). On August 30, 2005, neurologist, Dr. Jestus,

---

[4]Ms. Emery had undergone subacromial decompression of her right shoulder in January 2000 to address subacrominal impingement, acromioclavicular arthritis, calcific tendinitis, and rotator cuff tear (Tr. 329-30). In February 2000 she reported a 40-pound weight limitation at work, and Dr. Pagnani felt that it would be another 4 to 5 months before she could lift 40 to 50 pounds (Tr. 350).

13

reported that an EMG for bilateral hand numbness and pain had revealed a very mild ulnar neuropathy at the elbow and no EMG evidence of carpal tunnel syndrome (Tr. 409). He advised the etiology of the numbness was the ulnar neuropathy and that thumb pain was due to osteoarthritis. Id. On September 1, 2005, Dr. Joshi noted that the EMG had been unremarkable, that her back was unremarkable, and that she had no extremity edema (Tr. 418).

Ms. Emery had a new patient consult with Dr. Kanagasegar, a rheumatologist, on September 20, 2005, for evaluation of arthritis (Tr. 413-14). Ms. Emery rated her low back pain that day as a 3 on a 0-10 scale (Tr. 413). It was noted that she was not in any distress, had normal neck and shoulder movement with minimal discomfort, no active synovitis in her elbows and wrists, had normal hip movement, mild tenderness around the lower lumbar region, had no right knee effusion but slight pain with movement with good range of motion, no left knee effusion and normal movement, no ankle swelling, and no obvious soft tissue tender points of fibromyalgia (Tr. 414). The diagnosis was degenerative joint and degenerative disc disease, and possible left knee bursitis. Id.

On October 14, 2005, Ms. Emery had an endrocrinology consultation with Dr. Hijazi, who found she was normal neurologically with no edema in her extremities, and who noted that vitamin-D insufficiency could cause Ms. Emery's complaints (Tr. 416).

On October 25, 2005, Ms. Emery complained of weakness and tiredness to Dr. Joshi, whose exam was essentially normal (Tr. 417). He diagnosed lethargy, peripheral neuropathy, and arthralgia, gave her a B12 injection and continued her medications. Id.

Dr. Joshi completed an assessment of Ms. Emery's work-related abilities on November 5, 2005, wherein he advised that she could occasionally lift and carry 10 pounds, 4

14

to 5 pounds frequently, and could stand and/or walk, and sit 2 to 3 hours in an 8 hour day, 15-30 minutes without interruption due to constant back pain from severe degenerative disc disease of her lumbar spine (Tr. 410-11). He further advised that Ms. Emery had severe fibromyalgia, had to sleep in a recliner, had peripheral neuropathy, pain in both upper extremities, and carpal tunnel syndrome (Tr. 411). Ms. Emery could never climb, stoop, kneel, crouch, or crawl, could occasionally balance, and her ability to reach, handle, feel, push/pull were affected by her impairments. Id. Additionally, Ms. Emery was unsteady due to her medications and could not be exposed to moving machinery, and also could not be exposed to dust due to having multiple allergies (Tr. 412). Dr. Joshi related that Ms. Emery had constant pain in all her extremities and had to take analgesics for pain control. Id.

A cervical spine MRI on January 23, 2006, noted multiple levels of degenerative disc disease at C4-5, C5-6 and C6-7 with some central canal stenosis present, but no herniations noted at any level, and no abnormal cervical cord signal (Tr. 4 21). A left shoulder MRI found that the rotator cuff was intact, there was a degree of rotator cuff tendinitis present, and there was no acute edema noted (Tr. 422). In April 2006, Dr. Joshi treated Ms. Emery for pain in her lower extremities which he attributed to degenerative arthritis and possible fibromyalgia and provided medication samples (Tr. 459). In June 2006, she complained of increasing off-and-on confusion with ataxia, but Dr. Joshi's exam was normal and he advised Ms. Emery to see a neurologist (Tr. 459). In November 2006, Dr. Joshi treated Ms. Emery for bilateral hip pain, and noting marked tenderness over her right hip, he diagnosed bursitis (Tr. 458).

She was seen by Dr. Mendez, a neurologist, on July 31, 2006 (Tr. 450-52). Examination revealed that Ms. Emery's immediate and late recall was normal, she had a

15

somewhat anxious affect, normal hearing, normal shoulder strength, 5/5 muscle strength in

all extremities, normal muscle tone and bulk, no abnormal movements, did have some

limitation due to joint pain, had no focal weakness, normal sensation, and normal gait and

stance, including a negative Romberg test (Tr. 451).  Dr. Mendez reviewed Dr. Joshi's office

records.  Id.  Dr. Mendez found that Ms. Emery's complaints of unsteadiness and loss of gait

were of an unclear etiology (Tr. 451).  He noted that she had no objective findings of a

cognitive deficit, and discussed decreasing her use of pain medication (Tr. 452).  An EEG was

normal (Tr. 454).

Ms. Emery complained of chest discomfort in March 2007, but refused Dr.

Joshi's advice of hospitalization (Tr. 457).  On April 24, 2007, tests revealed that Ms. Emery

had an acute myocardial infarction (Tr. 456, 461, 466).

B.  Testimonial and Other Non-Medical Evidence

At her hearing on May 25, 2006, Ms. Emery testified that she lived in the

country on three acres with her husband of 36 years, who traveled all the time and came

home on weekends (Tr. 482, 502).  She had a driver's license and had last driven the day

before the hearing (Tr. 483).  Ms. Emery acknowledged that in the past year she had traveled

to Georgia and Missouri with her husband, and two years ago she had driven to Michigan to

visit an aunt (Tr. 484-85, 503).  She testified that she had pets, her hobbies were scrap

booking, and that the painting referred to in the record was an attempt to paint a wall.  Id.

Once in a while she babysat her grandchildren (Tr. 487).

Ms. Emery testified that her number one medical problem was her neck,

followed by her arms and shoulders, and then by her hands (Tr. 487-88).  She is right-

handed, making her symptoms on that side more bothersome (Tr. 488).  She also has

16

problems with her right knee, her lower back, and her hips. Id. Ms. Emery further testified that she had depression that was currently under control, and that she had anxiety that was also better (Tr. 489). Ms. Emery testified that if she were physically fine, she would be "hunky-dory" (Tr. 489).

Ms. Emery stated that her neck "catches" when she turned and that she did not drive unless she had to (Tr. 491). Because of her shoulders, Ms. Emery stated that she had to keep her arms against her body, and repetitive motion like washing windows or using a mouse were painful (Tr. 491). She also often had numbness and tingling in her arms and hands, left more than right (Tr. 491-92). She stated that she had a hard time healing after her right shoulder surgery and her shoulder never got back to normal, and she advised that she may require surgery on her left one to address tendinitis (Tr. 492-494). Ms. Emery further testified that she had moderate right carpal tunnel syndrome which bothered her when using a mouse, carrying a coffee cup, and driving (Tr. 495). Her right knee has given out on her, the left knee has started hurting and x-rays show that her low back and hip pain is arthritis (Tr. 495-96). Ms. Emery testified that it was a question as to how long she could tolerate the pain before she had to have neck surgery (Tr. 496). She advised that pain medication "killed" her concentration and she tried to use over the counter medications as much as possible (Tr. 500). Her pain exhausted her, and she spent her time in a recliner watching television (Tr. 500-01).

Ms. Emery further testified that she did not have good kidneys, had to go to the bathroom every fifteen minutes to one hour, and surgery had not corrected the problem (Tr. 497-98). Ms. Emery acknowledged never being under psychological care, even when thinking about suicide (Tr. 502).

17

At the hearing on October 5, 2007, Ms. Emery testified that her condition had become worse since her hearing, that she'd had a heart attack brought on by stress, and that she had a lot of anxiety (Tr. 509-10). She testified that she had a lot of neck pain and had to be careful how she moved it because she got headaches and arm pain, tingling and numbness (Tr. 510-11). Additionally, she had nerve damage that caused problems with three fingers (Tr. 511). She acknowledged not having any surgery on her neck or hands (Tr. 512). Ms. Emery testified that range of motion had improved after having right shoulder surgery, as long as she did not perform repetitive action or hold her arm out from her body (Tr. 512). She stated that she had been diagnosed with right carpal tunnel syndrome. Id. She had surgery on her right knee in 2003, but it still caused sharp pains and she had to avoid using the stairs (Tr. 514). Ms. Emery related that she had low energy due to hypothroidism (Tr. 515).

Since July 2003, she has to lie down often, and spends most of her time in a recliner (Tr. 519). She also stays close to the bathroom because she leaks on herself if she is not able to get there (Tr. 520). Ms. Emery testified that her memory was bad, her pain was at a 6 or 7 after taking medication, and the medication made her sleepy (Tr. 521-22).

### III. Conclusions of Law

#### A. Standard of Review

This court reviews the final decision of the SSA to determine whether that agency's findings of fact are supported by substantial evidence in the record and whether the correct legal standards were applied. Elam ex rel. Golay v. Comm'r of Soc. Sec., 348 F.3d 124, 125 (6th Cir. 2003). "Substantial evidence is defined as 'more than a scintilla of evidence

Case 2:08-cv-00051   Document 22   Filed 07/06/09   Page 18 of 33 PageID #: 89

but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007)(quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)). Even if the evidence could also support a different conclusion, the SSA's decision must stand if substantial evidence supports the conclusion reached. Her v. Comm'r of Soc. Sec., 203 F.3d 388, 389 (6th Cir. 1999).

B. Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. at § 423(d)(3). In proceedings before the SSA, the claimant's case is considered under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.

2) A claimant who does not have a severe impairment will not be found to be disabled.

3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.

4) A claimant who can perform work that he has done in the past will not be

19

found to be disabled.

5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)(citing, e.g., Combs v. Comm'r of Soc. Sec., 459 F.3d 640, 642-43 (6th Cir. 2006)(en banc)); 20 C.F.R. §§ 404.1520(b)-(f), 416.920 (b)-(f).

The SSA's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grids," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. See Wright v. Massanari, 321 F.3d 611, 615-16 (6th Cir. 2003). Otherwise, the grids cannot be used to direct a conclusion, but only as a guide to the disability determination. Id.; see also Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). In such cases where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert ("VE") testimony. See Wright, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4 (S.S.A.)); see also Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity ("RFC") for purposes of the analysis required at steps four and five above, the SSA is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Foster v. Bowen, 853 F.2d 483,

20

490 (6th Cir. 1988).

C.  <u>Plaintiff's Statement of Errors</u>

Plaintiff alleges error in the ALJ's determinations of (1) the severity of her depression, (2) the weight due Dr. Joshi's opinions, (3) the credibility of plaintiff's subjective complaints, and (4) the need (or lack thereof) for vocational expert testimony in this case.  As explained below, the undersigned finds error justifying reversal and remand for further proceedings in this case.

1.  <u>Plaintiff's Depression</u>

Regarding plaintiff's mental impairments, the ALJ's determination of nonseverity[5] is based on the lack of evidence showing that any work-related limitations arising from plaintiff's symptoms of depression or anxiety endured for any relevant twelve-month period.  (Tr. 17)  The ALJ recognized that both psychological consultative examiners, Mr. Loftis and Ms. Killian, diagnosed a depressive disorder with moderate features.  However, these diagnoses were made in 2004 and 2007, respectively, and  what little evidence there is of the actual treatment of this condition shows that its symptoms were very well controlled by prescription medications.  As the ALJ noted, plaintiff does not appear to have ever sought or received care from a psychiatrist or psychologist, and there is virtually

---

[5]The regulations define a severe impairment as one which significantly impacts the ability to perform basic work activities.  20 C.F.R. §§ 404.1520(c), 404.1521(a).  Such basic work activities include, *inter alia*, understanding, carrying out, and remembering simple instructions; use of judgment; and, responding appropriately to supervision, co-workers, and usual work situations including changes in the routine work setting.  20 C.F.R. § 404.1521(b).  A finding of nonseverity is appropriately made when the impairment in question is a slight abnormality which only minimally affects work ability.  <u>E.g.</u>, <u>Rogers v. Comm'r of Soc. Sec.</u>, 486 F.3d 234, 243 n.2 (6th Cir. 2007).

no medical evidence of any significant symptomatology prior to her consultative examination by Mr. Loftis in November 2004. The record shows that one of plaintiff's adult children died in February 2003 (Tr. 196, 503), causing an understandable increase in the severity of her depression (Tr. 499). However, there is no evidence to show that plaintiff had any difficulty doing her job throughout the spring of 2003, and her attempt to return to work in July 2003 following a seasonal layoff was allegedly derailed by her increasing physical pain (Tr. 153). By July 2004, Dr. Ngo recorded his opinion that plaintiff's depression did not significantly interfere with her functioning and had not required a psychiatric referral, but was only mild and was controlled with the medication Prozac. (Tr. 17, 324) Although there is some mention of worsening depression in October 2004 related to the loss of her son, plaintiff's Prozac dosage was reportedly increased "for pain control" (Tr. 282), with Topamax added for headache control the following month (Tr. 281). Thereafter, the combination of these two medications was reported to have substantially alleviated plaintiff's depressive symptoms (Tr. 17, 275, 279). Plaintiff candidly admitted at her first hearing in May 2006 that her symptoms of depression and anxiety were well controlled by medication at that time, though they had been somewhat worse six months prior. (Tr. 489) Given the dearth of evidence related to the treatment of plaintiff's mental impairments, as well as the evidence showing that what medical treatment she was receiving was quite effective, the undersigned finds substantial evidentiary support for the ALJ's determination that plaintiff's mental impairments were not medically severe for any continuous twelve-month period prior to April 24, 2007.

2. Plaintiff's Pain and Resulting Limitations

22

Plaintiff's arguments concerning the weight given the opinions of Dr. Joshi and her own subjective complaints of pain overlap, to the extent that both items were discounted by the ALJ for essentially the same reason: plaintiff's admitted activity level contradicts the level of restriction otherwise assessed/asserted. In particular, the ALJ deemed the restrictions advanced in the assessments of Dr. Joshi and the testimony of plaintiff to be undermined by plaintiff's confessed ability to drive or ride for long distances, such as when she accompanied her husband on business trips to Georgia and Missouri (Tr. 18-19). The ALJ also noted that plaintiff was able to travel from her home in Jamestown, Tennessee to her appointment with Mr. Loftis in Cookeville.[6] (Tr. 18, 265) While recognizing the objective medical proof of conditions capable of causing the symptoms alleged by plaintiff, as well as the great weight typically accorded the opinion of a long-time treating physician like Dr. Joshi, the ALJ placed greater stock in the countervailing evidence of plaintiff's ability to persist in driving longer distances, with secondary emphasis placed on (1) the improvement noted in her post-surgical physician visits and physical therapy sessions, (2) the fact that she was home alone two to three weeks per month, (3) the fact that she was occasionally able to babysit some of her grandchildren, (4) plaintiff's report to Mr. Loftis (Tr. 266), contrary to her earlier report to the agency (Tr. 153), that she quit work in July 2003 because the job had become too demanding and required more computer skills, rather than because of any increase in the severity of her physical limitations, and (5) psychological examiner Jerell Killian's observation that plaintiff "moved about with unrestricted mobility" and "utilized her arms and hands freely as she manipulated materials" during the examination. (Tr. 18-19)

---

[6]The driving distance between Jamestown and Cookeville is approximately 50 miles.
http://www.mapquest.com/maps?1c=Jamestown&1s=TN&1z=38556&2c=Cookeville&2s=TN.

23

a. <u>Plaintiff's Subjective Complaints</u>

Plaintiff argues that the ALJ's analysis of the credibility of her subjective complaints of pain is insufficient because it does not comport with the requirements of 20 C.F.R. § 404.1529(c). That regulation requires the ALJ, upon finding "a medically determinable impairment(s) that could reasonably be expected to produce [the claimant's] symptoms, such as pain," to then evaluate the intensity and persistence of the pain by reference to the record as a whole, including both the objective medical evidence and other evidence bearing on the severity of the claimant's functional limitations. 20 C.F.R. § 404.1529(c)(1)-(3). There is no question that a claimant's subjective complaints can support a finding of disability -- irrespective of the credibility of that claimant's statements -- if they are grounded in an objectively established, underlying medical condition and are borne out by the medical and other evidence of record. <u>Id.</u>; <u>see</u>, <u>e.g.</u>, <u>Walters v. Comm'r of Soc. Sec.</u>, 127 F.3d 525, 531 (6th Cir. 1997); <u>Social Security Ruling 96-7p</u>, 1996 WL 362209, 61 Fed. Reg. 34483, at *34484-34485 (describing the scope of the analysis as including "the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists or other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record"; "[A] finding that an individual's statements are not credible, or not wholly credible, is not in itself sufficient to establish that the individual is not disabled."). Such "other evidence" which the ALJ is bound to consider includes evidence of the following factors:

(i) Your daily activities;
(ii) The location, duration, frequency, and intensity of your pain or

24

other symptoms;

      (iii) Precipitating and aggravating factors;

      (iv) The type, dosage, effectiveness, and side effects of any medication
you take or have taken to alleviate your pain or other symptoms;

      (v) Treatment, other than medication, you receive or have received for
relief of your pain or other symptoms;

      (vi) Any measures you use of have used to relieve your pain or other
symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every
hour, sleeping on a board, etc.); and

      (vii) Other factors concerning your functional limitations and
restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3).

      It is well established that an ALJ may properly consider the credibility of a
claimant in conjunction with his consideration of the medical and other evidence described
above, and that this credibility finding is due great weight and deference in light of the ALJ's
opportunity to observe the claimant's demeanor while testifying.  Jones v. Comm'r of Soc.
Sec., 336 F.3d 469, 476 (6th Cir. 2003).  In considering the ALJ's finding on the weight of
plaintiff's subjective complaints, this court is "limited to evaluating whether or not the ALJ's
explanations for partially discrediting [plaintiff] are reasonable and supported by substantial
evidence in the record."  Id.

      There is no dispute in this case that plaintiff's medically determinable physical
impairments could reasonably be expected to produce the symptoms of which she complains.
(Tr. 18)  Beyond this acknowledgment, the ALJ in this case provided little meaningful
discussion of the medical evidence, instead focusing his attention on plaintiff's ability to
drive or ride for relatively long distances on occasion, as well as her ability to attend to the

25

daily requirements of self-care. Speaking in extremely conclusory terms, the ALJ found that "[t]he claimant would be [in] need [of] regular assistance if her subjective complaints were fully credible. She would be unable to prepare and clean up her own meals and perform other necessary household maintenance on a sustained basis." (Tr. 18) Although he cited other reasons for discounting plaintiff's subjective complaints pertaining to her credibility, these reasons are less than persuasive. Specifically, the ALJ noted that plaintiff had reported on one occasion that she quit work because her job had come to require more computer skills than she possessed and because it had become "more demanding" (Tr. 19, 266), rather than because of any increased severity of her physical limitations. However, the undersigned would question the extent to which a report of "more demanding" work is necessarily inconsistent with plaintiff's earlier report that her job "just started getting harder & harder till I just had to give it up - *My body won't do what it used to*." (Tr. 153)(emphasis added) The ALJ further noted that a consultative *psychological* examiner had observed plaintiff's "unrestricted mobility" and ability to manipulate materials using her arms and hands freely. (Tr. 19) This too is a questionable ground upon which to base an adverse credibility finding, as the psychological examiner did not purport to conduct a physical examination of plaintiff, nor is there any evidence of the movements plaintiff was required to make or the materials she was required to manipulate during her psychological examination and intelligence testing. In light of the foregoing, the undersigned finds a lack of substantial evidentiary support for the ALJ's finding on the credibility of plaintiff's testimony.

Moreover, despite noting plaintiff's testimony to medication side effects (Tr. 18), and despite Dr. Joshi's observation of same, the ALJ did not further address this issue.

26

Nor did he address plaintiff's level of daily activity,[7] instead focusing on her activities that were undertaken occasionally at best, such as driving or riding longer distances and babysitting her grandchildren "every great once in a while" (Tr. 487, 523-24). In short, despite referencing the need to consider "the criteria set forth in 20 CFR 404.1529 and Social Security Ruling 96-7p" (Tr. 18), the ALJ did not devote enough attention to these criteria to support his finding on plaintiff's level of pain-related limitation, particularly in view of the lack of support for his finding of plaintiff's credibility as a witness.

b. The Opinion of Plaintiff's Treating Physician

Regardless of whether the ALJ's discussion may be found sufficient to support his credibility-driven determination to discount plaintiff's subjective complaints, the standard to which the ALJ must adhere in discounting the opinion of Dr. Joshi -- plaintiff's treating physician of nearly three decades -- is much different. The opinion of a treating physician, if well supported by objective, clinical evidence and not substantially opposed on the record, is entitled to controlling weight pursuant to 20 C.F.R. § 404.1527(d)(2). However, even where such an opinion is not entitled to controlling weight, the Sixth Circuit has noted that "in all cases there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to great deference...." Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 242 (6th Cir. 2007). Accordingly, whenever the weight of a treating source opinion is discounted, claimants are assured that they will be provided with "good reasons" for the weight given their doctor's opinion. 20 C.F.R. §§ 404.1527(d)(2),

_____

[7]Plaintiff testified that her days were predominantly spent "[s]itting in a recliner reclined back watching TV." (Tr. 500) Other record evidence also indicates that sitting in a reclined position is a measure taken by plaintiff to relieve her pain. (Tr. 411, 522, 526)

27

416.927(d)(2). The regulatory requirement of good reason-giving has been described by the Sixth Circuit as an "important procedural safeguard" which the agency cannot disregard in an *ad hoc* fashion. Bowen v. Comm'r of Soc. Sec., 478 F.3d 742, 747 (6th Cir. 2007)(quoting Wilson v. Comm'r of Soc. Sec., 378 F.3d 541, 544 (6th Cir. 2004)).

As noted by the ALJ, Dr. Joshi rendered two assessments of plaintiff's capacity to perform work-related activities:

> In his November 5, 2005 assessment, Dr. Joshi essentially opined the claimant had the following limitations: lifting a maximum of ten pounds occasionally and four-five pounds frequently; standing and/or walking about two-three hours in an eight-hour workday for a maximum of fifteen-thirty minutes at a time; sitting about two-three hours in an eight-hour workday for a maximum of fifteen-thirty minutes at a time; no climbing, kneeling, crouching, stooping or crawling; occasional balancing; limited reaching, handling, pushing/pulling and feeling; and avoid [moving machinery] and dusts. (Exhibit 21F).

> In his May 30, 2007 assessment, Dr. Joshi essentially opined the claimant had the following limitations: lifting a maximum of less than ten pounds; standing and/or walking less than two hours in an eight-hour workday; sitting less than six hours in an eight-hour workday; alternating sitting and standing; limited pushing and pulling; no kneeling, crouching and crawling; occasional climbing, balancing and stooping; occasional reaching, handling and fingering; avoid excessive dust and vibration; and avoid hazardous machinery. (Exhibits 27F and 31F).

(Tr. 19) After reciting Dr. Joshi's opinions as contained in these two assessments and recognizing the great weight to which a treating source's opinion is normally entitled, the ALJ proceeded to offer the following analysis of these opinions:

> These limitations would leave the claimant unable to drive or even ride more than very short distances, and arguably would make self care problematic. The claimant's admitted activity level contradicts such findings.

28

(Tr. 19)

Following this brief rationale, the ALJ, in considering the period from July 14, 2003 to April 23, 2007, proceeded to assign weight to Dr. Joshi's "opinion" (presumably the opinion rendered in November 2005) "only to the extent it supports the conclusion that the claimant had the following limitations:  lifting a maximum of twenty-thirty pounds occasionally and ten pounds frequently; standing and/or walking about two-three hours in an eight-hour workday; sitting about six hours in an eight-hour workday; no climbing or crawling; and only occasional stooping or kneeling[.]"  Id.  The net result of this finding is that the ALJ accepted Dr. Joshi's 2005 opinions that plaintiff could only stand for up to three total hours out of eight, and that she could not climb or crawl.  He rejected Dr. Joshi's significantly more restrictive assessment of the amount of weight plaintiff was capable of lifting on a frequent and occasional basis;  his opinion that she must frequently change position from standing to sitting, and must be limited to sitting no more than three total hours out of eight; his opinion that she must never be required to kneel, crouch, or stoop; his opinion that she was limited in her ability to balance, reach, handle, push/pull, and feel; and, his opinion that she must avoid dust due to her allergies and moving machinery due to her unsteadiness (a medication side effect).

In stating the aforementioned reasons for his weighting of Dr. Joshi's opinion, the ALJ again speaks in extremely conclusory terms.  Unfortunately, the ALJ did not get any more specific in regard to his rejection of large portions of Dr. Joshi's assessment than to say that plaintiff's "admitted activity level" contradicts her physician's findings (Tr. 19).  Hearkening back to his analysis of plaintiff's subjective complaints, it appears that the ALJ

29

defined plaintiff's "admitted activity level" to include taking "a number of trips with her husband to Georgia and Missouri," staying home alone while her husband traveled 2-3 weeks per month, and "baby sitting some of her grandchildren, although this has become less frequent since her first hearing." (Tr. 18-19)

However, it simply cannot be said that plaintiff's admitted activity level contradicts all of the rejected findings of Dr. Joshi. At worst, his finding of plaintiff's restriction to sitting only 2-3 hours per 8-hour day for only 15-30 minutes at a time is undermined by her admission to accompanying her husband on trips out of state. Even then, plaintiff's testimony at her 2006 hearing did not detail her seating arrangements for these occasional road trips, whereas she testified at her 2007 hearing that such trips were taken in a van which would allow her to recline or even lie down as needed (Tr. 522, 526). Plaintiff evidently did not do the driving on any longer trips, testifying at her first hearing that the furthest she had driven in the past year was from Jamestown to Knoxville, Tennessee,[8] and further testifying that her mother does most of the driving when they ride together. (Tr. 483, 491) Moreover, the record reveals that plaintiff's admission to babysitting her grandchildren was qualified as occurring "every great once in a while, [and] not all [her grandchildren] together." (Tr. 487, 523-24) As to her "ability" to stay home alone and care for herself for extended periods, the extent to which Dr. Joshi's assessment would "arguably make self care problematic" simply does not present a contradiction compelling enough to support the rejection of that assessment.

---

[8]The most expeditious driving distance between Jamestown and Knoxville is approximately one hundred miles.
http://www.mapquest.com/maps?1c=Jamestown&1s=TN&1z=38556&2c=Knoxville&2s=TN.

Notably, as referenced supra, the ALJ's decision almost entirely fails to discuss the evidence of plaintiff's lengthy medical history of treatment for physical problems, other than to list her prescription medications, observe that her multiple surgeries and post-surgical physical therapies were at least initially successful, and reference a finding of "only mild ulnar neuropathy." [9] (Tr. 18) These few references to the medical record are offered in support of the ALJ's finding on the credibility of plaintiff's subjective complaints. In subsequently addressing the validity of the treating physician's opinions, the ALJ summarized the assessments of Dr. Joshi, and made oblique reference to the contrary report of the nonexamining, state agency physician. (Tr. 18-20) However, the ALJ did not discount Dr. Joshi's opinions by reference to his own treatment records, or the records and opinions of any other physicians, but solely by reference to the inconsistency he perceived between Dr. Joshi's opinions and the level of activity plaintiff was able to maintain. (Tr. 19) In light of the preceding discussion regarding the questionable value of those perceived inconsistencies, the undersigned must find that good and sufficient reasons under § 404.1527(d)(2) were not given in this case.

Even if good reasons exist for the rejection of Dr. Joshi's opinions, no such

---

[9]This finding was included in a letter to Dr. Joshi from Dr. Joseph A. Jestus, a neurologist. In this letter dated August 30, 2005, Dr. Jestus observed that an EMG conducted by a Dr. Gaw had revealed no evidence of carpal tunnel syndrome. (Tr. 409) However, an EMG performed on July 23, 2004, had revealed moderate right carpal tunnel syndrome (Tr. 288-90), and both Dr. Joshi and the nonexamining state agency consultant acknowledged limitations in accordance with this earlier finding. These two physicians provided the only two assessments of plaintiff's specific work-related abilities in the record. Moreover, plaintiff testified at her first hearing that she had significant difficulty using her right hand, particularly if she needed to use the mouse on a computer or do much writing (Tr. 488, 491, 494). Rather than acknowledging this conflict in the evidence, the ALJ merely made reference to the finding of only mild ulnar neuropathy. (Tr. 18)

31

reasons were adequately articulated in the two sentences which the ALJ devoted to the issue. Cf. Barnhill v. Astrue, 2009 WL 902432, at *5 (E.D. Ky. Mar. 31, 2009)("These two sentences do not fulfill the dual purpose of the good reasons requirement--(1) to help the claimant understand the disposition of his case, and (2) to permit meaningful review of the ALJ's application of the treating physician rule.").  More recent decisions of the Sixth Circuit have distinguished the decision in Wilson as requiring reversal of the agency decision only where the treating physician's opinion was either ignored or summarily dismissed without adequate justification.  See Barnhill at *6 (citing cases); Bass v. McMahon, 499 F.3d 506, 512 (6th Cir. 2007).  The decision of the ALJ in this case to discount Dr. Joshi's opinions on the grounds asserted amounts to a summary dismissal of those discounted opinions without compelling justification, in derogation of the agency's duty to comply with its own regulation, 20 C.F.R. § 404.1527(d)(2).  Wilson, 378 F.3d at 545.  This regulation, as interpreted by Wilson and its progeny, requires more in the way of explanation than was provided by the ALJ here, notwithstanding the significant deference which is typically accorded an ALJ's credibility finding.

It is possible that a *de minimis* violation of § 404.1527(d)(2) may constitute harmless error, such as where "a treating source's opinion is so patently deficient that the [ALJ] could not possibly credit it," or where the regulation's purposes were fulfilled despite the violation.  Wilson, 378 F.3d at 547.  However, the violation in the case at bar is not *de minimis*, and therefore not harmless.

In sum, the undersigned concludes that the ALJ's finding of nondisability prior to April 24, 2007 should be reversed, with remand for further administrative consideration

32

of the matter.

## IV. Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be GRANTED, that defendant's motion for judgment on the administrative record be DENIED, and that the decision of the SSA be REVERSED and the cause REMANDED for further administrative proceedings consistent with this report.

Any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

ENTERED this 6th day of July, 2009.

s/ John S. Bryant
JOHN S. BRYANT
UNITED STATES MAGISTRATE JUDGE